UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | |
| DARREN STEWART | NO.: 18-00019-BAJ-RLB |

### RULING AND ORDER

Before the Court is the **Motion to Suppress (Doc. 13)** filed by Defendant, Darren Stewart, seeking the suppression of evidence seized during a warrantless search of his garage on October 18, 2017. (*Id.* at ¶¶ 2–3). The United States filed an Opposition. (Doc. 16). On June 1, 2018, the Court held an evidentiary hearing. (Docs. 17, 19). For the following reasons the **Motion to Suppress (Doc. 13)** is **GRANTED**.

I.  BACKGROUND

On October 18, 2017, Baton Rouge Police Department ("BRPD") Narcotics Detectives Nicholas Collins, Jeremiah Ardoin, and Roderick McCoy, surveilled a residence located on Madison Avenue in Baton Rouge, Louisiana, after receiving an anonymous telephone complaint "a day or two before" from an "unreliable and unverified complainant" that an individual known as "D-Boy" was selling drugs out of the residence's garage. (Doc. 16 at p. 2; Doc. 19 at pp. 36–37). Each detective drove a separate unmarked vehicle and wore a vest that displayed a BRPD badge on the front and the word "POLICE" emblazoned in large letters on the back. (Doc. 16 at p. 2). Before he parked in his surveillance location, Detective Collins drove past the

residence and noticed that the garage door was opened and its contents observable from the public street. (*Id.*). He claims to have observed two unknown black males inside of the garage sitting in chairs. (*Id.*).

Detective Collins then parked his vehicle on Madison Avenue and began his surveillance. (*Id.*). From his location, he had a clear view of the residence, but he could no longer see inside of the garage. (*Id.*). About five or ten minutes after parking his vehicle, Detective Collins observed a vehicle park in the middle of the street in front of the garage. (Doc. 19 at p. 19). An unknown person exited the vehicle and walked into the garage for approximately one minute before returning to the parked vehicle and leaving the area. (*Id.*). About five minutes later, Detective Collins observed a second vehicle park in front of the garage. (*Id.* at p. 20). An unknown person exited the passenger side of the vehicle and walked into the garage for approximately one minute before returning to the vehicle and leaving the area. (*Id.*).

Detective Collins testified that because two people within only a few minutes had quickly entered and left the garage, he believed that narcotics transactions had occurred inside of the garage. (*Id.* at pp. 21–22). He then directed another detective to pursue the second vehicle to investigate the activity inside the garage under the guise of a traffic violation for "obstruction of a roadway." (*Id.* at pp. 21–22, 62). Detective Collins then testified that the stop "was going to turn into an investigatory stop" in order to ascertain information regarding the activity in the garage. (*Id.* at p. 62). However, after the vehicle was stopped by the detective, the passenger exited the vehicle and fled the area while the vehicle's driver evaded the detective. (*Id.* at p. 21).

Consequently, after about fifteen minutes of surveillance, Detective Collins abandoned his surveillance, exited his vehicle, and approached the garage, which was only a short distance from the street, to continue the investigation. (Doc. 19 at pp. 20, 23; *see also* Doc. 16-1). The passenger fleeing from the detective prompted Detective Collins to abandon his surveillance because he believed that there was a possibility that the person who fled the vehicle could warn Defendant that the police were watching his residence. (Doc. 19 at pp. 21–23). As a result, Detective Collins testified that he intended to "make contact" with the garage occupants "to try to validate the claim [narcotics complaint]" before they could be warned; he conceded that he did not have probable cause to arrest Defendant, to search the garage, or to get a warrant at that time. (*Id.* at pp. 22–23).

As depicted in his body camera footage, the garage door was still completely open. (Video at 21:45:46).[1] Detective Collins testified that he smelled marijuana when he exited his vehicle, and he further testified that the odor grew stronger as he walked up the driveway to the garage. (Doc. 19 at p. 24). Detective Collins also testified that before entering the garage, he saw loose marijuana out in the open in the garage. (*Id.* at p. 27). However, it was not photographed or presented as evidence at the hearing. His body camera footage does not depict loose marijuana at the time he entered the garage. (Video at 21:45:46–21:45:52). The footage depicts a heavily congested garage area with items that would inhibit sight and movement. (*Id.*; *see also* Doc. 16-2). Specifically, the footage shows that the garage was packed to the brim with all sorts

---

[1] Detective Collins' body camera footage was tendered at the suppression hearing as Defendant's Exhibit 3 (hereinafter "video").

3

of items, such as an Igloo Cooler stacked on top of multiple children's bicycles and other toys, as well as a golf cart and a fan stacked on top of a box. (Doc. 16-2). The footage also shows that the garage was very dark and crowded, with little to no space to move around. (*Id.*).

Detective Collins also testified that as he came within fifteen feet of the garage, he observed Defendant remove an unidentified object from his person and discard it to the left of his seat. (Doc. 19 at pp. 25, 51). When the object hit the ground, Detective Collins claims he heard a loud clink, which he claimed to have recognized as the sound a handgun makes when it hits the ground.[2] (*Id.* at pp. 25–26). The video footage does not contain audio during this part of the encounter. Detective Collins then entered the garage and approached Defendant and the other garage occupant ("Defendant's cousin"); however, the video does not depict Defendant removing an object from his person, an object hitting the ground, or any noise/clink (audio begins at 21:45:59). The video also depicts a box with a fan sitting on top, which obstructed the area where the firearm allegedly dropped to the ground. (Video at 21:45:51–21:45:53).

Detective Collins testified that after hearing the distinct sound,

> I drew my weapon and advised everybody in there to put your hands up. Put your hands in the air. And I kind of bladed [sic] myself to a brick wall they had on the left-hand side to make sure that I was out of the way in case something did happen and everyone complied at that point. And I re-holstered [sic] my weapon and when Detective Ardoin came behind me I went and contacted [Defendant and his cousin].

(Doc. 19 at pp. 26–27).

---

[2] Detective Collins claimed that he came to the conclusion that the item that he did not see was a firearm based on his experience of having heard a gun hit the ground approximately 50 to 100 times and the fact that it is common practice for those involved in narcotics to carry a firearm for protection. (*Id.* at p. 26).

4

However, the footage shows that Detective Collins casually entered straight into the garage—without taking cover behind the wall—to secure Defendant and his cousin, and the video does not depict that his gun was ever drawn or holstered. (Video at 21:45:51–21:45:53). Further, the footage shows both individuals with their hands in the air; Defendant has a video game controller in his left hand. (Video at 21:45:53–21:45:58). The footage then depicts Detective Collins (in the presence of a second detective) approach both individuals, who are sitting in chairs; he then proceeded directly to the cousin and cleared a laptop from his immediate vicinity. (Video at 21:46:10–21:47:18). Detective Collins then handcuffed both individuals. The first to be handcuffed was the cousin, during which Defendant remained seated without handcuffs. (*Id.*). Detective Collins then advised them both of their *Miranda* rights. (*Id.*). Although Detective Collins claims he heard the sound of a firearm dropping before entering the garage, neither the footage nor his testimony suggests that the second detective was informed about, or alerted to, the possibility of a firearm near the Defendant who, at the time, was still sitting where the gun was claimed to have been dropped without handcuffs and within arm's reach. (*Id.*).

After explaining to both individuals that they were under arrest because of complaints of drug trafficking, the footage depicts Detective Collins questioning Defendant regarding, *inter alia*, the contents of the garage and/or drug evidence "in plain view" in the garage, such as "mojo," synthetic marijuana, and "bath salts." (Video at 21:47:18–21:47:52). Only after approximately 35 seconds of questioning, Detective Collins inquired about the object Defendant dropped when Detective Collins walked up the driveway. (*Id.*). Particularly, while shining his flashlight in the

area next to Defendant's seat, Detective Collins asks "what you put down [sic] right here when I walked up? Oh a pistol okay . . . I see what you got going on here." (Video at 21:47:48–21:47:59). Neither Detective Collins nor the other detective moved to secure the firearm at that time. (*Id.* at 21:47–21:48). The firearm first appears in the footage at 21:48:26, between the chair and clutter.

As depicted in the video, the garage has a concrete floor (Video at 21:45:52). Under the Defendant's chair was a small dark-gray piece of carpet or a mat around Defendant's left foot (*Id.* at 21:46:05, 21:46:40, 21:47:15). A second piece of carpet appears under the right front leg of Defendant's chair; it is lighter in color and angled toward the right (both pieces of carpeting are clearly visible near the video game controller) (*Id.* at 21:46:40, 21:47:15). The floor is otherwise obstructed by clutter, shadows, and lack of lighting in the garage.[3]

Detective Collins moved both individuals and their chairs to the driveway, during which time he laughed and treated the situation casually.[4] (Video at 21:48:17–21:49:05). Shortly thereafter, Defendant completed a consent to search form authorizing a search of the garage. (Doc. 16 at p. 4). "During the search, the detectives recovered approximately 24.93 grams of synthetic marijuana blends and approximate[ly] 4.73 grams of methamphetamine." (*Id.*). However, during cross examination, Detective Collins testified that "roaches," which are the remains of a

---

[3] The presence of carpet or a mat was raised for the first time during cross examination. Defendant noted the carpet on the floor in an attempt to establish the possibility that the firearm may have fallen onto carpet, rather than the concrete floor, in an attempt to establish that Detective Collins may have been untruthful regarding whether he actually heard the sound a firearm makes when it hits concrete.

[4] Detective Collins' treatment of the situation is relevant to the issue of exigency.

joint or blunt, were discovered during the encounter and/or search, but that he decided not to seize them, which he admitted was in direct contravention of BRPD policy on the seizure of drug evidence. (Doc. 19 at pp. 46, 60, 66–67). On February 21, 2018, Defendant was charged by a one-count Indictment with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1).

## II. DISCUSSION

It is well established that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quotation marks omitted) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). Generally, "[t]he proponent of a motion to suppress has the burden of proving, by a preponderance of evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir. 1993) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992)). However, in cases where a warrantless search occurs, the United States bears the burden of proving that the search was valid. *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citing *United States v. Castro*, 166 F.3d 728, 733 n.6 (5th Cir. 1999)).

### A. Reasonable Expectation of Privacy

The United States argues that Defendant does not have standing to challenge the search because, by leaving the garage door open, he "knowingly revealed the contents of the garage to public view" and thus he did not have a reasonable expectation of privacy in the garage's contents (Doc. 16 at pp. 4–5). The United States

further asserts that "[D]efendant took no precautions to maintain the privacy of the contents of the garage, and exhibited no subjective [or objective] expectation of privacy in them." (*Id.* at p. 5; Doc. 19 at p. 71).

To the extent the United States argues that the plain view exception applies to the evidence seized from the garage that Detective Collins' could see from the driveway, the Court agrees that Defendant, indeed, lacked a reasonable expectation of privacy in the contents of the open garage. *See United States v. Jones*, 239 F.3d 716, 722 n. 5 (5th Cir. 2001). An individual does not have the same expectation of privacy concerning articles that can be seen in plain view through a voluntarily opened door as opposed to the privacy one expects when a door is closed. *See United States v. Santana*, 427 U.S. 38 (1976) (holding that a suspect cannot claim a privacy interest after exposing herself to public view through an open doorway).

However, to the extent the United States argues that Defendant must establish a subjective expectation of privacy before "the detectives' 'intrusion' [can] be subject to Fourth Amendment scrutiny," such argument is misguided. (Doc. 16 at p. 4). The United States seems to assert that where there is reasonable suspicion, a Defendant who leaves the doors to his home open subjects himself to governmental intrusion such that officers are free to enter if they observe incriminating evidence in plain view through that open door.

However, "[i]t is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (quoting *United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972)). And a principal protection against

8

unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest. *Id.* (citing *Johnson v. United States*, 333 U.S. 10, 13–14 (1948)). It follows that, "a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show . . . the presence of exigent circumstances." *Id.* (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 474–475 (1971)). Therefore, Defendant has standing to challenge the search.

B.  **Exigent Circumstances—Warrantless Entry Into Garage**

The United States argues, in the alternative, that the entry into the garage was justified by exigent circumstances. (Doc. 16 at p. 6). In response, Defendant argues that Detective Collins did not have probable cause to enter the garage, to search the garage, to arrest Defendant, or to get a warrant. (Doc. 19 at pp. 69–70). Defendant further argues that Detective Collins is not being truthful regarding whether he heard the sound of a firearm hit the ground due to the presence of carpet; thus, there were no exigent circumstances to justify a warrantless entry into the garage. (*Id.* at pp. 70–71).

A person's garage is an extension of his home.[5] A warrantless intrusion into an individual's home is presumptively unreasonable unless the person consents or probable cause and exigent circumstances justify the encroachment. *Jones*, 239 F.3d at 719; *see also Steagald v. United States*, 451 U.S. 204, 211 (1981); *Payton v. New*

---

[5] *See e.g.*, *L.A. Police Protective League v. Gates*, 907 F.2d 879, 885 (9th Cir. 1990) (finding that an "attached garage" constituted curtilage for purposes of Fourth Amendment analysis). *United States v. Sanchez*, 2009 WL 10681489, at *11 (D.N.M. Feb. 17, 2009), *aff'd*, 608 F.3d 685 (10th Cir. 2010) ("The garage is an extension of the home . . . .").

9

*York*, 445 U.S. 573, 586 (1980); *United States v. Vega*, 221 F.3d 789, 798 (5th Cir. 2000). "In other words, even if the officers had probable cause to search the [garage], they had to have exigent circumstances to enter without a warrant." *United States v. Aguirre*, 664 F.3d 606, 610 (5th Cir. 2011).

The possibility that evidence will be removed or destroyed, the pursuit of a suspect, and immediate safety risks to officers and others are exigent circumstances that may excuse an otherwise unconstitutional intrusion into a residence. *Jones*, 239 F.3d at 720 (citing *United States v. Richard*, 994 F.2d 244, 248 (5th Cir. 1993)). "Because it is essentially a factual determination, there is no set formula for determining when exigent circumstances may justify a warrantless entry." *United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997). The United States Court of Appeals for the Fifth Circuit has looked to the following non-exhaustive list of factors to assess whether an exigency justifies a warrantless search:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the reasonable belief that contraband is about to be removed; (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought; (4) information indicating that the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic.

*Blount*, 123 F.3d at 837 (citations omitted). The Fifth Circuit has consistently held that the presence of a firearm alone does not create an exigency without reason to believe that a suspect is aware of police surveillance. *Jones*, 239 F.3d at 720 (citing *United States v. Munoz–Guerra*, 788 F.2d 295, 298 (5th Cir. 1986)). And the presence of drugs alone does not give rise to exigent circumstances justifying a warrantless

entry and search. *United States v. Howard*, 106 F.3d 70, 74 (5th Cir. 1997) (citing *Munoz-Guerra*, 788 F.2d at 298).

Moreover, the government's own action or inaction cannot be the likely cause of an exigent circumstance. *Jones*, 239 F.3d at 720 (citing Vega, 221 F.3d at 798). In assessing whether the officer created the exigency, the Fifth Circuit focuses on the "reasonableness of the officers' investigative tactics leading up to the warrantless entry." *Blount*, 123 F.3d at 838.

### *1. Reasonableness of Investigative Tactics*

At the outset, the Court finds that Detective Collins' investigative tactics, namely his "knock and talk" strategy, leading up to the warrantless entry was not inherently unreasonable. Federal courts have recognized the "knock and talk" strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity. *Jones*, 239 F.3d at 720 (citing *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991), *cert. denied*, 502 U.S. 907 (1991)) ("Reasonable suspicion cannot justify the warrantless search of a house, but it can justify the agents' approaching the house to question the occupants.").

Here, Detective Collins testified that his purpose in approaching the garage was to identify the occupants and discuss the complaints of drug activity before the fleeing individual had the opportunity to warn Defendant that his residence was being watched. (Doc. 19 at pp. 21–22). Detective Collins further testified that his intention was to "make contact" with the garage occupants to attempt to validate the narcotics complaints, and that he was not there to arrest Defendant or to search the

garage. (*Id.* at pp. 22–23). The Court finds that this investigative tactic is not inherently unreasonable.

### *2. Whether Exigent Circumstances Were Present*

Before entering the garage, Detective Collins needed *both* probable cause and exigent circumstances. *Aguirre*, 664 F.3d at 610. The United States contends that based on a totality of the circumstances, both exigent circumstances and probable cause were present because (1) Detective Collins received a complaint, albeit uncorroborated and unreliable, that Defendant was selling drugs out of his garage; (2) he had reason to believe that there were drugs inside the garage after observing what he believed to be two narcotics transactions; (3) upon his approach for a "knock and talk" he smelled and observed marijuana in plain view; (4) he also allegedly observed Defendant discard an object from his person, which object made a clink sound—similar to a firearm—when it hit the ground; and (5) he knew from experience that persons who engage in drug trafficking often carry firearms.

The United States does not contend that the detective's warrantless entry was even partially motivated by concern for any possible destruction of evidence. And at no time did Detective Collins attempt to make the argument that the warrantless entry was motivated by his concern for his own safety or the safety of others. (Doc. 19 at p. 68). According to the United States, the detective acted reasonably under the circumstances when he entered the garage without waiting to obtain a warrant.

When determining whether exigent circumstances exists, the Court "must consider the circumstances objectively as they would appear to a reasonable and prudent person. *United States v. Albarado*, 555 F. App'x 353, 356 (5th Cir. 2014)

(citing *United States v. Troop*, 514 F.3d 405, 409 (5th Cir. 2008)). However, when reasonable minds may disagree, a court should "not second guess the judgement of experienced law enforcement officers concerning the risks of a particular situation." *United States v. Menchaca–Castruita*, 587 F.3d 283, 290 (5th Cir. 2009) (internal quotation marks and citation omitted).

Detective Collins testified that "extenuating circumstances [arose after] hearing the click on the ground and smelling the strong odor [of marijuana] and standing at the door looking at what I believed to be marijuana, that gave me *probable cause*, I believe, to detain [Defendant and his cousin] at that point and either get a consent to search or get a warrant." (Doc. 19 at pp. 64–65) (emphasis added). He further testified that he was sure that the sound came from a firearm hitting the ground because he had heard that sound 50 to 100 times in his career and because it is common for drug dealers to carry weapons for protection and "muscle." (*Id.* at p. 26).

Nonetheless, Detective Collins did not establish in his testimony that there was an immediate safety risk to officers and others; that is, exigent circumstances because probable cause alone is not enough. The body camera footage demonstratesis evidence that Detective Collins did not believe that there was any immediate safety risk to officers or others; thus, there were no exigent circumstances to justify the warrantless intrusion into Defendant's garage.

The facts before the Court do not support the presence of exigency. Based on inconsistencies between the body camera footage and the testimony of Detective Collins, the Court concludes that several aspects of Detective Collins' testimony

lacked credibility. The Court finds that it is exceptionally unlikely that Detective Collins heard what he believed to be a firearm hitting the ground. Detective Collins testified that after hearing the distinct sound of a firearm hitting the ground from the driveway, he drew his weapon, maneuvered himself to the brick wall, and after ascertaining that the coast was clear, he holstered his weapon. (Doc. 19 at pp. 26–27). However, his body camera, which is positioned near his stomach on the left,[6] shows that Detective Collins casually entered straight into the garage and that there is no movement showing that his weapon was drawn then holstered. (Video at 21:45:51–21:45:53). From where the body camera was positioned on the officer's body, the Court would expect to observe such movements.

Importantly, after entering the garage, Detective Collins secured the cousin first, walking straight past the Defendant, despite his testimony that he saw Defendant's downward movements and heard what he thought to be a firearm drop. (Video at 21:46:10–21:47:18). He even turned his back to Defendant as he secured the cousin while leaving the firearm within Defendant's reach. (*Id.* at 21:46:18). Moreover, neither officer on the scene exhibited any behavior that would be expected of an officer who believes a firearm to be present in an area where multiple individuals are suspected of drug trafficking activity: Detective Collins left Defendant within arm's reach of a firearm, turned his back to him, and only asked questions about the dropped item after questioning Defendant about drug evidence. An officer

---

[6] Detective Collins testified that "[m]y body cam was positioned right here on my vest, that's the only place for it to get to a location where it won't fall off, so it's kind of low. You don't get the height and visibility that I can see right here with a flashlight . . . . . That's why you kept seeing my arm right here covering the screen when I'm moving." (Doc. 19 at p. 57). The United States clarified that Detective Collins identified that his body camera was located in his stomach area. (*Id.*).

14

in fear of his safety or the safety of others would make securing a known or suspected firearm his top priority.

When Detective Collins finally inquired about the object Defendant allegedly removed from his person, his demeanor and questions in the video were inconsistent with that of an officer who believed a firearm was present. (Video at 21:47:48–21:47:59). Instead, the Court finds that Detective Collins realized Defendant had a firearm only after he entered the garage. (*Id.*). Although Detective Collins may have seen Defendant remove an object and place it to his left, Detective Collins' actions belie his testimony that he believed that object was a gun. Detective Collins had to look under the chair with a flashlight and inquired of Defendant "what you put [sic] down right here when I walked up? Oh a pistol okay . . . I see what you got going on here.? (Video at 21:47:48–21:47:59). Neither Detective Collins nor the other detective moved to secure the firearm before or after inspecting the area where the Defendant had dropped it. (*Id.* at 21:47–21:48).

The legality of this search hinges largely on the detectives belief that Defendant possessed a firearm before entering the garage. Considering that the treatment of the firearm was casual and light-hearted; that, at the outset, Detective Collins and the second detective did absolutely nothing to secure either the firearm or the unrestrained Defendant who was within arm's reach of the firearm; and that Defendant was not ordered, at the least, that his hands were to remain in the air pending restraint, the Court finds that no exigent circumstances were present. (*See* Doc. 19 at p. 68). The legality of this search hinges largely on the detectives subjective belief that Defendant possessed a firearm prior to his entry into the garage. The video

15

evidence coupled with the detective's testimony requires the Court to conclude that his belief is unfounded and cannot be substantiated.

Although Detective Collins testified that he has heard between 50 and 100 firearms drop during his career and that he was familiar with the sound that they make, the totality of the circumstances suggests that Detective Collins did not hear what he believed to be a firearm drop. The video evidence does not support his testimony, there is no audio to corroborate a sound, nor was there any testimony from anyone other than Detective Collins to corroborate that they too heard the sound that a firearm makes when it is dropped.

The Court does not take lightly its duty to make credibility determinations, but the Court cannot credit the uncorroborated testimony of Detective Collins that he believed a firearm was present in the garage. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) ("Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it."). The United States did not present testimony from any other officer on the scene, and as previously noted, no officer acted consistently with the belief that Defendant had a firearm. Because the video evidence refutes Detective Collins' testimony, the Court does not credit his testimony that he heard a gun fall to the ground; and thus, exigent circumstances did not exist to justify the warrantless intrusion into Defendant's garage.

The only other argument that the United States makes concerning exigent circumstances is that the individual who had previously fled could warn the occupants of the house that they were under surveillance (*see* Doc. 19 at pp. 21–22).

Although evidence "indicating that the possessors of the contraband [were] aware that the police [were] on their trail" can create exigency, see *Blount*, 123 F.3d at 837, at the time he decided to approach the garage, Detective Collins testified that he did not intend to arrest Defendant, search the house, search the garage, or even believe that he had probable cause to obtain a warrant (Doc. 19 at pp. 22–23). The officers certainly had a right to approach the house and make contact with Defendant, but the United States offered no evidence that based on the fleeing suspects—who were being pursued by other officers—the officers who approached the house believed exigent circumstances existed that justified entry into the garage.

### III. CONCLUSION

Accordingly,

**IT IS ORDERED** that the **Motion to Suppress (Doc. 13)** is **GRANTED**.

Baton Rouge, Louisiana, this 20th day of July, 2018.

_____
**BRIAN A. JACKSON, DISTRICT JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**